January 27th, 1817. The Judges pronounced their opinions seriatim.
Judge Coalter.
The Act of Assembly, passed the 19th of February 1816, requiring the Clerk of this Court, with others, to give Bond and Security for the faithful performance of the duties of their offices, being devised by the Legislature for the greater security of suitors, is one, which as far, as depends on me, I am willing to execute; that is to say, to judge of the securities, who may be offered; to see to the execution and recording of such Bond ; and to the recording of any other Bonds, which may be sent into this Court for that purpose.
I am unwilling, however, to lay the Clerk under a Rule to give such Bond, or to express any opinion as to the obligations, which the law imposes on him to do so, or as to what may be the consequences to him should he fail to comply with its requisitions. Could I be satisfied that this Court were the Judges in the last resort of this question ; that we could declare the law, as well as fix its sanction, and carry it into effect, I should not hesitate to enter upon the subject, concern *357 ing which, however, I have not formed, nor do I mean in the slightest degree to intimate an opinion. But, when I consider, that not this Court, but another is finally to try and judge of the case, I am unwilling, by any opinion of mine, to mislead the parly, either into the surrender of his rights on the one hand, or to lay himself obnoxious to a penalty on the other; must therefore leave him to act at his peril, making Known my willingness to receive the Bond, should it be oiiered.
Could I believe the Act authorized me, in this case, to declare that the execution of Bond and Security, as required by it, was a condition, upon the non-performance of which the estate of the Clerk in his office must cease and determine, in the same manner, as that of a Clerk appointed since the Act, I should have no hesitation in giving an opinion whether the Law was obligatory on the Clerk or not; and, if I thought it was. 1 would, on his failure, declare the office vacant, and proceed to make a new appointment. The failure of a Clerk, newly appointed, to give Bond, I apprehend, would not be considered a misbehaviour in office, for which he must be indicted and removed by the General Court, he holding his office until such removal; but would at once, be held here, as the non-performance of a condition, without doing which, he was not completely Clerk, although he might hold a Commission from the Judges of this Court, or their appointment of Bcoord. Every thing cannot be done at the same moment; and he must be appointed before he can either take the Oath or give Bond.
In this case though, I understand that no Judge is prepared to say, that, on the failure of the Clerk to give Bond, we can, without farther trial, declare the office vacant, and proceed to a new appointment.
If the Bond is not given, and that failure does not, ipso facto, vacate his office, so that this Court can appoint a new Clerk, the party may, nevertheless, by disobeying the law, be guilty of an ofienee, either in his private character, or in his office of Clerk, punishable before a competent tribunal; or, if he is correct in the grounds, which he has taken in shewing cause in this case, he may be altogether innocent; but if? *358 is not for me to say whether he ought to be acquitted or found guilty, or what ought to be his punishment.
A rule on the Clerk to give Bond would not, as I conceive, impose any greater obligation on him to do so, than now exists under the Law: for,should he still fail, unless I could proceed to a new appointment, as aforesaid, I fear the rule would be a dead letter, though the law may not be ; as he would not be indicted for a disobedience to the rule, but for not complying with the law. As to enforcing obedience to such rule by attachment, unless there was something more disrespectful to the Court, than the mere non-execution of the Bond, I should consider the ground taken in the argument isi this case, to-wit, that the party was advised and believed the Law unconstitutional, and that, as to this matter, he wished a regular trial before a competent Court and Jury, as sufficient ground for not awarding such attachment. Or, if ' -'arty should state his inability to give such Bond and Security, surely this would purge any thing like contempt: and yet, “the greater the inability to give Security, the greater necessity there might be to enfore the Law. The consequence would be, that, in the end, we must either discharge him from the alleged contempt, or imprison him until he gives Bond or resigns his office; and, in the mean time, he may be acquitted upon an Indictment before another Court.
I greatly doubt, therefore, whether, in a case of this kind, where the alleged offence would proceed from no corruption in office; where the course of justice would in no wise be delayed ; where no disrespect would be intended to the Court; but, merely, where the party may or may not be under a mistake as to his constitutional rights, which he thinks he can avail himself of before a proper tribunal, the extraordinary remedy by attachment ought to be resorted to; and the more especially, as it might terminate in the way above supposed.
I can therefore see no good, that is likely to result from doing more, than what is expressed in the order, which is to be entered in this case.
Judge Brooke. If the decision of this Court could enforce the Act of the Legislature, requiring the Clerk to give Bond with Security, it would, in my opinion, be the duty of the *359 Court to express an opinion on many of the points, that have been so ably discussed by the Bar: but the Act of 1816, “ concerning the General Court, and for other purposes,” does not seem to me to require any thing more of this Court, than, to adjudge the sufficiency of the security, and to receive the Bond, when tendered by the Clerk. This construction of that Act is deduced from a consideration of ii in connexion with the 11th section of the Act of October 26,1792, entitled, “an Act reducing into one Act the several Acts concerning the Court of Appeals,” &c. The consequences of the failure of the Clerk to comply with the requisitions of the first mentioned Act, it appears to me, are to be decided, if any where, in another Court; and I hold il myself to be improper to forestall the opinion of that Court by the decision of questions, not judicially before this. I admit that an extra-judicial opinion of ibis Court ought not, and 1 presume would not be considered as authority in any other Court, though inferior to this. It might have some influence and tend to violate a great principle, viz. that no citizen ought to be prejudged any where. If, indeed, I was convinced that this Court, acting diverso intuitu, ought to make the Rule absolute on the Clerk, and by its process could compel him to give the Bond required by the Act before cited, it would be unimportant to me what might be the consequence of its decision in another Court; but I am not satisfied that this Court is so instructed by the Act, under which the Rule, now under consideration, was made. The 2d section of that Act does nothing more, than require of the Clerks therein mentioned to give Bond with Security, to be approved by the Courts of which they are Clerks; and the 2d clause of the 3d section of the same Act declares that, if any Clerk thereafter appointed shall fail to give Bond, ho shall forfeit his office; plainly indicating that the Clerks then in office were not to forfeit their offices, for a like failure, by the decision of the Court, of which they were Clerks. But, if it could be inferred, from any thing in the Act, that this Court ought to make the rule upon the Clerk absolute, I know of no process here, by which it could enforce its judgment, and effect the object of the law. It is not pretended that a forfeiture of the office would be the consequence of the failure of the Clerk to obey the rule. The only process to which the *360 Court could resort, it has been admitted, would be an attachment f°r a contempt: but I am unable to perceive that inability to give the Bond with Security, if it should so turn out, would be a contempt of the Court; and I am unwilling to give a Judgment, which might be ineffectual. It is true, that if, by the order or decree of a competent Court, an individual was required to give Bond with Security, and failed to do it, he would be guilty of a contempt, and an attachment would be the proper process to compel him: but that Order or Decree would be founded on i some pre-contract, or some transaction leading to that consequence : or if, in this case, I could be convinced, that the failure to give the Bond would be the neglect of an official duty, enjoined upon the Clerk by the order of this Court, I should deem it proper, that he should be attached for the contempt: but, how the failure, to give a Bond for the faithful performance of his duties as Clerk, can be a neglect of that duty, I am yet to learn. An attachment in this case might compel him to resign; but, as that would not be the object of the law, the Court would not do that indirectly, which it could not do directly. I am of opinion, therefore, that the entry agreed upon by a majority of the Court, is the proper one in this case.
Judge Roane. This case comes before the Court upon a Rule upon the defendant, as Clerk of this Court, to shew cause, why he should not give the Bond required of him by the Act of February 19th, 1816, ch. 32.
Although there has been no regular rule made of Record, nor any formal service upon the Clerk, the Court informed the Clerk that it required this Bond from him; and, on his declining to give it, he asked and obtained leave to shew cause against it. That cause has been shewn, and the effect of our judgment will be to discharge the rule, which is to be understood as made, or make it absolute. The Judgment now to be given is also to be rendered nunc pro tunc : it will relate back to the time when the Bond was required, and will consequently overreach the 1st of November 1816, the day, on or .before which the Bond is required to be given. The Judgment will so relate, because the case was taken up in due time by the Court, and was only postponed at the instance of *361 the defendant, and on account of the absence of his Counsel. If, therefore, on the rendition of this Judgment, or within a reasonable time thereafter to be limited by the Court, the Bond in question shall be given, the defendant will have complied with the requisition of the Act, although the day above-mentioned is now passed.
The cause shewn by the defendant by his able Counsel against this rule, and the only cause is, that the act in question is unconstitutional as it regards him, because it imposes a duty on him, which, he contends, the Legislature had no right to impose. This broad and important question it is my intention to discuss and to meet: but I understand that my Colleagues have waived a decision upon it. 1 am glad to find that they have done so, because, under our present impressions, as dis~ closed in conference,- we should probably not have agreed upon this important question. I wao glad to find, also, that they seemed to agree with me that two Judges, of a Court, consisting of five, ought not to exercise the high power of declaring an Act of the Legislature unconstitutional. The memorable Glebe Cause, in this Court, furnishes a precedent on this important point. The number of the Members, who sat in that cause, having been reduced to three by the death of our venerable President, and two of those three being of opinion that the law in question was unconstitutional, the Court, on my motion, declined to decide the cause, on this ground, (although every Judge was prepared to deliver his opinion,) until the vacancy in the Court was supplied : as soon as that was done, the cause was argued anew, at great length, and the result of the decision was entirely varied. The course, which, 1 understand, is now pursued by the majority of the Court, conformably to this great precedent, gives me satisfaction: they do not decide against the Act on the ground of unconstitutionality; they do not sanction the pretensions, as I think, the extravagant pretensions, advanced by the defendant’s Counsel: they give no opinion upon the great question, made by the defendant’s Counsel: they only decline to give an opinion in the case. That question, therefore, remains entirely open for decision, whenever, hereafter, the Court shall think it ought judicially to decide it,
*362 In thus declining to decide upon this great question, I ani sol'ry that I cannot concur with my worthy colleagues. I must be pardoned for saying that I differ from them entirely. I can* not discern how, if the law be not unconstitutional, if the authority of the Act be unquestioned, which Act makes it the duty of the Clerk to give a Bond in the Court by a certain day, and makes it the duty of the Court to take sufficient Security thereto, the Court can avoid perfecting this duty. I do not see that an Act of the Legislature, passed in pursuance of the Constitution, is to be considered as a dead letter. I do not see why a posterior qualification is not to be administered to the Clerk, if it be legally required of him, as one which is original. I understand it to be the duty of the Court to exact from the Clerk every Bond, which forms a part of his qualification for the office, and not leave it to the mere pleasure of the Officer, whether he will give the Bond, or not. It is at least the duty of the Court to exact it so far, as to render a Judgment that he should give it; however it may be as to ulterior measures to enforce it, as by attachment, or otherwise, on which at present I forbear to give an opinion. In thus acting, the Court proceeds civilly, and with a view to a specific performance (if I may so express myself,) of a most important duty. This Court has no right to suppose, (and on that ground to forbear to give its opinion,) that the defendant will stand out against its decision, when declared, and that he will, in consequence thereof, be prosecuted, before another tribunal, on the ground of a forfeiture of his office. This event may happen; but, until it does happen, its possible occurrence forms no reason why this Court should not proceed. If it does happen, that Court will proceed entirely diverso intuitu from this Court: it will proceed as a Criminal Court, and on the ground of an offence already committed. Under such different circumstances, therefore, there can be no objection to .each Court acting upon the same subject. A solemn duty imposed on this Court is not to be abandoned; because the same question may possibly arise in another Court of an entirely different character, and under an entirely different state of things. There is no trait in the genius of our institutions which justifies the abarw *363 doning the specific performance of a regulation of great public utility, because the offender may be punished for not performing it, and from a fear that what is done in one case may have an influence in the other. It is more desirable, under the spirit of our laws, that, a measure of great public utility should be carried into effect, than that the party should be punished for not performing it. The objection now taken is that this Court ought to leave the question free for the criminal Court, in the possible case, which may happen. This objection seems to me to be grounded in too much delicacy, not to say squeamishness, and requires from us too great a sacrifice. It requires from this Court a dereliction of a solemn duty. I shall not stop to inquire what would be the effect of the opinion of this Court in the criminal Court; but it strikes me at present, that that Court would not hold it obligatory ; and then the ground of this objection would fail. That Court would probably so decide, because it would hold itself supreme in its criminal jurisdiction : but, at any rate, the Jury, in that Court, would pass upon the whole case, including law and fact, the decision of this Court not excepted.
We ought, therefore, as I humbly conceive, not to shrink from this duty, and are bound to meet and decide the great, question made by the defendant’s Counsel.
In shewing cause against the rule in this case, the defendant, by his Counsel, has only made the objection, that it was incompetent to the Legislature to throw a new duty upon him of the character of the one in question, on account of his being an existing Clerk: on account, as they alleged, of its invading a vested Interest. They have not complained, nor could they complain, that the penalty of the Bond required is unreasonable ; for then, it might be argued, that it was rather the design of the Legislature to oppress the Clerk than to advance the public interest: the reasonableness of the penalty is established by the consideration that it is the same penalty, which had, before, been required from other Clerks of lower degree, than the Clerk of the Supreme Court of the Commonwealth. They have not complained, nor could they complain, that the few Clerks, embraced by the provision in ques tion, were singled out as the objects or victims of the mea *364 sure in question: for then a suspicion of a similar intention have been possibly entertained: the object of the Act was to round the whole cap, by requiring the same Bond, from these Clerks, which all others of similar character had already given. They have not denied, nor could they deny, but that the measure is most salutary, and necessary for the public good, if it be constitutional: such a denial would stand confronted by the general sense of the Legislature, which, in every other instance, has required similar Bonds. It stands also confronted by the fact that our people are compellable, in many instances, to place their money and their muniments of title with the Clerks, and that those Clerks may sometimes, prove to be equally insolvent and abandoned. Those Counsel have taken the single ground of unconstitutionality above mentioned; and they could have taken none other.
In the view I have taken of this subject, it Í3, perhaps, not very important to decide, whether the defendant holds his office during good behaviour, by a constitutional, or a legislative tenure; though it is obvious that, in the last case, the power of the legislature to regulate or abolish the office is less questionable. No instance has occurred of a constitutional officer being wholly deprived of his office: whereas the former Court of Appeals and District Courts have been abolished / because the public good required it, and the Judges acted therein, respectively, as mere legislative Judges. A power to abolish, would seem to include a power to regulate •, not in a wanton manner, indeed, and to oppress the officer, but to promote and advance the public good.
On the best consideration, I can give this subject, it seems to me that the Clerk of this Court holds his office by no constitutional tenure. The 14th section of the Constitution, which relates to the appointment and tenure of the Judges of this Court, and most of the higher officers of government, says nothing about the appointment or tenure of the Clerk's thereof. That was the proper place to have provided for it, had it been intended. On the other hand, the 15th section relates solely to Justices and officers of inferior rank, (with the exception of the Secretary,) appertaining to the County Courts and to the Counties. There is not a word in this section, which can be *365 icrtured to apply to the appointment of the Clerks of the Superior Courts ; and it is therefore unnatural to apply the provision therein, relating to the tenure of the Clerks, to them. These words can he abundantly satisfied without, and cannot on any lair construction, be extended to the Clerks of the Superior Courts. They can not be so extended, because the first sentence of that section only relates to the County Courts, as it only relates to the Justices thereof; because the second sentence thereof, in which Clerks are first introduced, and that In relation to their continuance in office, is in terms confined to tho Clerks of County Courts ; because, in the third sentence thereof, the Clerks, thereby intended, not only mean those of the County Courts exclusively, for other reasons, hut because th“y stand coupled w’ith the Secretary, as the County Court Clerks were, in the second sentence, before coupled, and because the term “ vacancies” also confines it to the class of Clerks already in office, and established in their tenure by the Constitution, and not to those for whose appointment a future provision was to be made ; and because, in the fourth sentence thereof, the word “ future” is a word of relation to “ present,’’ and indicates Clerks of the same, and not of another class or character. These reasons, added to the forcible reasons, urged by the Attorney General, and to which I beg particular reference, strongly induce me to think that the tenure of the Clerks of the Superior Courts is not provided for in the Constitution : and such was the contemporaneous construction of the primeval Legislature. In none of the original Acts, constituting the Superior Courts, is any idea held out that the Clerks of those Courts hold by a constitutional tenure: and if, in the acts of a later period, the style is somewhat changed,, it rather imports that the trial for misbehaviour is to be in the General Court under the Constitution, than that that instrument establishes the tenure of the office ; which also is probably a mistake.
If, in this particular, I am to be governed by the constructions of the Legislatures, I should prefer those, which are contemporaneous, and to which, under certain restrictions, great credit is admitted to be due: for we are told by that great Judge, Lord Holt, (in the case of Harcourt v. Fox, 1 Shower 535,) “ that cotemporaria expositio est optima, because the tent” *366 “ per of the law makers is then best known.” It is also a ciicumstance of great weight on this subject, that, while all the respecting the County Courts, and making new Counties, make no provision for the appointment or tenure of their Clerks, this is done in every instance, in every Act establishing a Superior Court, in the Act itself. (1)
If, then, this Clerk is a legislative, and not a constitutional officer, there can be no objection to any regulations prescribed to him by the Legislature, unless it be on the ground that the Act shall have declared that the Clerk shall hold during good behaviour, and the Clerk has consummated the contract by accepting the office. It may here be observed, that even this trait is perhaps wanting in the case before us. The law constituting this Court, of 1792, (1 R. C. p. 62,) does not give the tenure of good behaviour, otherwise than by implication. The most it says is that the C|erk is to be “ removable for misbc- “ haviour, in the manner prescribed by the Constitution.” But this compact, even when it is express and explicit, must not be held to too much strictness. What then would you do with the Tipstaff and Cryer of the General Court, who, under the yc£ 0f i777; establishing that Court, (a) were made, equally with the Clerk, to hold their offices during good behaviour. It would be rather ludicrous to see an Information filed in the General Court, against their Tipstaff, for refusing to bring a pitcher of water to the Judges, or to carry their letters to the post office. The truth is that some power must be given to the Legislature, and the interests of the people are entitled to some consideration ; while the substantial rights of the officer are not to be lightly invaded. He is to hold during good behaviour, as contra-distinguished from a tenure during pleasure; but he is not to obstruct any salutary reform: he is not to ride upon the top of his commission, to swagger and beard the Legislature at every corner, nor to seize upon the merest apiees litigandi to contend that a legislative Act is unconstitutional. It *367 would be strange indeed, if, while the Legislature can whittle down Constitutional Courts to nothing, and abolish such as are only legislative ; if, while they can increase, almost without limits, the duties of Judges, as well as Clerks, and even diminish the salaries of the former, so as not to get below the mark prescribed by the Constitution ; it would be strange that, if, while they are in the daily habit of assailing vitally the rights of the Clerks themselves, by adding heavy duties, abolishing their Courts, reducing their fees, and dividing their Counties and Districts, this wholesome and salutary regulation should be alone beyond their power.
The doctrines of the common law of England, in relation to the appointment and tenure of officers, as indeed almost all the constitutional law of that country, must bo received in this country with many grains of allowance. I hazard but little in saying that the interests of the people are held more sacred in a Republic than in a Monarchy. In that country, all offices flow from the King by virtue of his prerogative : (a) in this country, that prerogative is abolished by the Constitution. In that country, some offices are held in fee, others in tail, and others by various other tenures : in our Bill of Rights it is declared, that magistrates are the trustees and servants of the people, and offices are prohibited from being hereditary. If iu that country, this boasted tenure of “ good behaviour” is amenable to the power of parliament, by virtue of its alleged omnipotence, it is here amenable to that of our limited Legislature, when it is supported by the principles of the Constitution. In all the decisions in that country, as to the inviolability of this tenure, there is an exception of the power of parliament; and in all the decisions to be given here, there must be a correspondent exception in favour of the power of the Legislature, when acting within the limits of the Constitution, and supported by the principles thereof. It has been said that the officer before us has a freehold in his office ; and it has even been said that he has the same title to it, as if it were land. This last idea finds no countenance in our Bill of Rights, and is even reprobat ed by the principles of the common law of England. Although it may be that he has a freehold in his office, it is not one without impeachment of waste. He is answerable for all dilapida *368 tions in his office. He has a freehold in his office, I admit ¡ but it is only sub modo. It is subject to the principles of our Bill °f Rights, and the greater interests of the people. If he has this tenure, it is not for his own benefit, but theirs. Am I not correct then in saying, that while the just rights of the officer to his office and its emoluments, are not to be invaded, the greater rights of the people are not to be surrendered ? A libera! construction ought to prevail in this country, therefore, under the influence of these principles, although it may produce some loss or inconvenience to the officer. But even in England it is held, in general, (a) that if an officer acts contrary to the nature and duty of his office, the office is forfeited, it will be found that this principle has been acted upon in this country without objection, and that acts, relating to the office, essential to the public good, have been required from the officer, and always acquiesced in, although not falling, perhaps, within the narrow limit of ordinary official duties.
Thus, by the Act of October, 1784, ch. 60, after imposing an oath of office on the Clerks of the County Courts thereafter admitted into office, the Act goes on, in the 5th section thereof, to require that every Clerk of a County Court then in office, should take the said oath, as soon as may be, after the commencement of the Act, and that, failing therein for six months thereafter, he should forfeit the sum of one hundred pounds. Here is a new qualification imposed slap dash upon the then existing Clerks, varying only in degree, not in character, from the one now in question. Again, it was enacted, in the same section of the same Act, (October, 1784,) that every Clerk, appointed since June 4th, 1776, (more than eight, years before the passing of the Act,) as well as those hereafter appointed, should reside in the County in which they hold their respective offices, under penalty of being incapacitated therefrom by information in the General Court. This provision affected Clerks then in office ; and it is not easy to see how it differs in principle from the case before us. This last provision of the Act of 1784, is in substance kept up and repeated in the Act of 1792, § 5 ; (b) thereby evincing the concurrence of two Legislatures on the subject: the first mentioned provision was omitted in the Act of 1792, only because all the Clerks within its purview, had, before the passage of the Act of 1792, by *369 taking the required oath, complied with the requisition"™ question. There was no hubbub raised in the country by these Salutary regulations, although they went farther than the section before us, in affixing penalties, and declaring an incapacity for the office, in case of non-compliance. The acquiescence in both measures was universal, and affords a strong proof of the sense of the people, as well as the Legislature in relation to the principle in question. The oath repuired in the first instance was as much a new qualification, and was as wide from the ordinary duties of the office, as the bond now required. If then the legislature is justified in the principle, on which it proceeds^ who is to limit them as to expediency ? As to the measure of the sanction, deemed necessary for the interest of the people ? So, the change of residence imposed on existing Clerics by the second provision was equally a new duty, equally out of the line of ordinary official duty, and equally injurious and inconvenient, to the then incumbents, (to say the least,) with the duty required in the present instance. It required of them perhaps to purchase and procure a new place óf residence. And the Epoch of June 1776 was then fixed on, because thenceforward a new system was to prevail, which consulted the interest of the people as well as that of the individual.
Again ; in the Act, which first divided the High Court of Chancery, (a) it was made the duty of the Clerk of that Court, (and that without any compensation allowed therefor by that Act,) to arrange and send out to the other Courts, thereby established, the papers thereto belonging. This Act, after almost ruining the Clerk, by the withdrawal of his fees, makes him, as it were, commit the act himself. The principle of this provision has been followed up, in all the subsequent divisions of our Courts of Chancery and Courts of Law. This duty has always been performed, though, so far from falling in with the idea of an ordinary discharge of official duty, it in a degree prevents the possibility thereof. It is an acft too, attended with expense and inconvenience, perhaps, at least, equal to that required in the present instance, I have never heard of a murmur or complaint, against this exercise of power, by the Clerks, or others, although the measure cut deep in every instance. It was universally acquiesced in,
*370 In all these several instances, (and, I expect, others of a similar character might be shewn,) the acts required of the Clerks were not within the strict line of their antecedent official duty, and could none of them, except, perhaps, the last, have been performed by a deputy : yet they were required from the officers, as Clerks; and, without their co-operation and assent, these salutary reforms could not have been effectuated. The ground now taken would have defeated the wishes of the Legislature in every instance; and yet the officer would have been held irresponsible J! I conclude, therefore, that every thing is to be considered as an official act, under the principles of our Constitution, which the Legislature has a right to exact from the officer, and which he alone can perform. The Clerk of this Court can alone give the bond required by the Act; and this is decisive of the question. It is far too narrow a construction to say that nothing is an official act, which cannot be done by deputy. This idea is overruled in the instances I have mentioned; and would even prove the original swearing in and giving bond by the Clerk to be private and not official transactions ! !
This view of the case is decisive of the present question, unless a difference is taken in consequence of security being demanded from the Clerk. I have already said, that this case differs only in degree, not in principle, from those already stated : and I even understood it to be conceded that an oath or bond required from the Clerk himself would, not have been objectionable. This case Í3 not more foreign than the others from the ordinary routine of official duty. It agrees with them in this, that they are all necessary to a salutary reform in the system, and can be done by the Clerks, and none other. It is essential to the object in this instance, that security should be given : for the want of responsibility in the officer has made the measure necessary. To object to giving security for the faithful discharge of duty, in a case, in which an officer may not have principle enough to prevent his plundering his suitors, nor fortune enough to repair the damage, is objecting to the remedy altogether. It is objecting to it, at the same time that our people are compelled to place themselves within his power.
In point of hardship, too, the measure required, though a sine qua non of the reform, can not exceed the other requisi *371 tions of the laws before noticed. Applied to this case, it is hardly credible, that a man, who fills the Clerkship of the highest Court in the Commonwealth cannot get security in the moderate sum of ten thousand dollars; a sum required from the Clerks of many of the Courts of subordinate character. If this should unfortunately be the fact, it is an extreme case ; and this Court is not to take extreme cases into its consideration. If this should chance to he the fact, it shews the wisdom of the law in question, and augers ill to the safety of the bailors in this Court. If this should be the fact, it is better, that a particular inconvenience should he borne by the Officer, than a general grievance by the public. It is better that an unworthy, or even an unfortunate member should he lopped off, than that the whole community should suffer. But there is no such inconvenience in the case before us. This ground has not been taken by the Clerk in this case, and we have no right to assume it for him. He places his case on general principles, and by these it ought to he decided. As to the objection, more particularly, that, although a Clerk may be called on to act by himself, he ought not to he compelled to get the aid of others; there is certainly nothing in it. Nothing is more common than for a man to contract to do, or be decreed to do an act, which does not depend upon himself merely, but on others. Such instances occur every day in the Courts of Equity; and the principles, which guide the decisions of those Courts, form a correct standard for the government of the Legislature. A Court of Equity will always compel a man to do by another that, without which he is not entitled to the relief he seeks. The objection ought not therefore to prevail in this case; especially, when it strikes at the root of the reform. If the Legislature once surmounts the objection now' in question; if it once gets over the line marked out for them by the defendant’s Counsel, namely, the ordinary course of official duty, none can limit them on the ground of expediency. They are not to he limited, at least, when they have adopted the only remedy for the evil: nor when their work shews no design to oppress, and invade the just rights of the Officer, but only to advance the good of the public.
Every argument now urged by the defendant’s Counsel, voald hold a fortiori in favour of the former District Court *372 Clerks, who, though holding by law expressly during good be» haviour, were deprived of their offices on the erection of the Superior Courts. They were so deprived, although they were permitted, in general, by the Legislature, to have a preference as Clerks of the Superior Courts. These arguments would equally hold, in favour of the Clerks last mentioned, if the Legislature were to abolish those Courts and restore the former District system. In that event, a great majority of the present Clerks of the Superior Courts must remain wholly unprovided for. If the Legislature, acting for the interests of the people, should deem it proper to restore that excellent system, ought it to be impeded by the claims of these legislative Clerks ? Ought their individual good to be preferred to that of the community ? Ought they not to submit to a condition, tacitly annexed to their Office in its creation, -and of which they could not have been ignorant, unless they shut their eyes upon the Bill of rights, that of holding in subservience to the public good 1 Or ought they to demand pensions from the .Legislature equal to their supposed injury? The idea is ridiculous; and yet the present is a weaker case than that; for that case supposes a total extinction of the Office, whereas the Clerks in question are only subjected (for the public good) to some possible in-? convenience.
If a Clerk has come into Office under a law, requiring no oath of Office, owing to the improvidence of our predecessors, or the trivial nature or amount of the then business of the Court, ought not an oath to be required from him, when these circumstances are essentially changed ?• Let the wise Act of 1784, already noticed, answer this question. If, owing to the greater value of money at a former period, and the smaller amount of business at that time confided to a Court, a small penalty has been required, ought it not to be enlarged, when our money has greatly diminished in value, and the trusts confided tq the Clerk have greatly increased ? If, in the progress of reform, the public interest requires that more monies should be paid into the Office, and more valuable papers should be confided to the Clerk than formerly, ought not his responsibility to be increased therewith? Ought this increase of responsibility to be objected to by him, when, in consequence of the augmentation of his business, the emoluments of bis Office have been also greatly increased ?
*373 But it has been said, that the Legislature have, in the Act before us, given an exposition on this subject, by expressly subjecting future Clerks to the loss of their Offices, while the Act. is silent in this particular as to the then existing Clerks. The Legislature have in the plainer case declared what should be the penalty of disobedience : in a case less plain, they have properly left it to the Courts They have, in this last case, only declared what should be the duty of the Clerk; and have properly left it to the Courts to say what should be the consequence of a non-compliance. They have left it to the proper tribunal to say, whether the duty in question was legally demandable of the Clerk, and, if so, what should be the consequence of a non-compliance. While they have expressly imposed a duty upon the Clerk, they have left this last question to be decided upon by the general principles of the law, and not under any express provision of the Act. That decision will be to be made, in the proper Court, whenever the question shall occur, if it shall ever occur, upon the exhibition of an information or indictment, having for its object the amotion of the Clerk from his Office. With that question, I have, at this time, and in this Court, nothing farther to do, than as it may be necessarily involved in deciding the question now depending before us. That question is, whether we ought not to adjudge that the defendant should give the bond required of him by the Act. For the reasons I have assigned, I think we ought; and that the rule should be made absolute. That, however, is not the opinion of the majority of the Court. Their opinion has been already made known by them; and I now deliver the following, as the opinion of the Court, and it is to be entered accordingly.
“ The Clerk of this Court being required by the Act of “ Assembly, passed on the 19th day of February, 1816, to enter “ Bond and Security, on or before the first day of November u last, in the penalty of ten thousand dollars, payable to the “ Governor for the time being, and conditioned for the faithful “ performance of the duties of his office, and having, before “ the said first day of November, obtained leave to shew cause 5t against executing said bond, the time to do which has been s* extended to the present day, although no formal entry has *374 “ been made thereof on the records; the Court is of opinion, “ that no neglect or laches is to be attributed to the said Clerk “ for not executing the said Bond heretofore, but that the Rule “ is to be considered as entered nunc pro tunc, and continued “ until this time. And the Court, this day, having fully heard “ and maturely considered the causes alleged by the said “ Clerk, why he should not give said Bond, is of opinion that “ it is not proper for this Court to dispense with, or sanction “ the non-execution of the Bond aforesaid, as required by the “ Act aforesaid, or to pronounce any opinion as to the consequences of a failure to do so; but leaves it to the Clerk to “ execute said bond, or not, at his own peril, to be adjudged “of, in ease of failure, by a Court having competent jurisdic- “ tion of the case: and the Rule is therefore discharged. And, that the said Clerk may not be prejudiced by the time taken to shew and consider the cause aforesaid, Bond will be " received by the Court within fifteen days.”
February 10th, 1817. The Clerk gave bond, with Security approved by the Court, which was ordered to be recorded. (1)

 Ch. Rev. p. 70.

 Note by Judge Roane. I have the most satisfactory authority for saying, that the Judges of the General Court, in conference, upon Hening's case, in June, 1815, were unanimously of opinion, except one Judge, (who probably did not wish to give an opinion upon the question,) that the Clerk of the Superior Court of Chancery (Hening,) was a legislative Clerk, and did not hold his office under the Constitution ; though the case was decided upon another point, namely, the Act of Limitations.

 5 Bac. 136.

а) 5 Bac. 210.

 1 R. C. ch. 70, p. 95.

 1 R. C. p. 426.

.) Note. See also the Acts of 1816—17. ch. 24. p. 30.